## In re William S. Geohegan et al.

*Voluntary Assignments—Judgments by Confession—Whether a Valid Preference—When Such Preference is Given.*

1. Until he has made up his mind to make an assignment, a debtor retains the dominion over his property and may sell, mortgage or pledge it, or create a lien upon it by confessing a judgment in favor of a *bona fide* creditor.

2. A preference is given to a creditor, so far as the debtor is concerned, not by entry of the judgment but by the execution of the warrant of attorney. If that instrument is given at a time when the debtor may lawfully prefer a creditor, the preference is valid.

3. Under the statute of this State the creditor will be protected if he in fact succeeds in perfecting his lien before the assignment becomes operative. Knowledge of the insolvency of his debtor, or of his intention to make an assignment, or of his being actually engaged in the execution of such instrument, can not deprive him of his preference, if he in fact succeeds in obtaining one.

4. Mere non-action on the part of the debtor until the creditor has perfected his lien, does not make the procuring of such lien his act. The statute imposes upon him no duty of diligence to defeat the priority of creditors who hold valid warrants of attorney.

5. Upon a petition to have certain executions against the property of an insolvent debtor vacated and to have said executions and the judgments on which they were issued declared to be a part of the general assignment, it is *held:* That there is no evidence of such active co-operation on the part of the debtors in the entry of the judgments by confession as to make them their acts; that the liens are therefore valid; and that they do not constitute an illegal preference within the meaning of the statute.

[Opinion filed December 14, 1887.]

In error to the Circuit Court of Cook County; the Hon. Murray F. Tuley, Judge, presiding.

Messrs. Abbott & Baker, for plaintiff in error.

Mr. Frank P. Leffingwell, for defendants in error.

The entry of the judgments by confession and the delivery

of the executions to the Sheriff, were a fraud upon the assign¯ ment law. Hahn v. Salmon, 20 Fed. Rep. 801, and cases cited; Preston v. Spaulding, 10 N. E. Rep. 911; Sartwell v. North, 10 N. E. Rep. 824; Wilson v. City Bank, 17 Wall. 473, 487; Buchanan v. Smith, 16 Wall. 307.

The entry of the judgments, levying of the executions and making of the deed of assignment must be construed to be part and parcel of the same transaction. Preston v. Spaulding, 10 N. E. Rep. 903, and cases cited; Berry v. Cutts, 42 Me. 445; Perry v. Holden, 22 Pick. 269, 275; Holt v. Bancroft, 30 Ala. 193, 200; Livermore v. McNair, 34 N. J. Eq. 478, 482.

The rule in construing a remedial statute, though it may be in derogation of the common law, is, that everything is to be done in advancement of the remedy that can be done consistently with any fair construction that can be put upon it. C., B. & Q. R. R. Co. v. Dunn, 52 Ill. 260.

The law will not permit that to be done indirectly which can not be done directly. That which violates the policy of a statute is as much condemned as if it violated the latter. The law no more tolerates an evasion of a statute by artifice than a palpable violation of it. Holt v. Bancroft, 30 Ala. 193, 300. See also, Livermore v. McNair, 34 N. J. Eq. 478, 482; U. S. v. King, Wall. C. Ct. 13; Downing v. Kintzwig, 2 Serg. & R. 335; Oates v. First Nat. Bk., 100 U. S. 239.

BAILEY, J. This was a petition in a proceeding in the County Court under the statute in relation to voluntary assignments, praying that the liens of certain executions against the property of the insolvent debtors be vacated, and that said executions and the judgments upon which the same were issued be declared to be a part of the general assignment for the benefit of creditors. Said petition was denied by the County Court, but upon appeal to the Circuit Court a hearing was had and an order entered against the prayer of the petition, and the record comes here by writ of error.

On the 1st day of December, 1885, the firm of W. S. Geohegan & Company, consisting of William S. Geohegan, Harry Geo-

hegan and Thomas Fitch, then doing business as merchants in Chicago, executed three judgment notes maturing thirty days after date, one for $200 payable to the order of Joseph H. Fitch, one for $703.89, payable to the order of Sarah A. Geohegan, and one for $2,137.30, payable to the order of Eliza J. Geohegan, the warrant of attorney accompanying each note authorizing the entry of judgment by confession at any time after said date for the amount of the note, attorney's fees and costs. As to the *bona fides* of the indebtedness for which said notes were given, no question is raised, and the evidence shows beyond controversy that, at the time said notes were given, said firm, though somewhat embarrassed, had not determined to make an assignment, and were not in fact contemplating any such step.

It appears that the creditors to whom said notes were given were all relatives of the members of said firm; Sarah A. Geohegan being the mother of William S. and Harry Geohegan, Eliza J. Geohegan the widow of their deceased brother, and Joseph H. Fitch the husband of their sister and a brother of Thomas G. Fitch, the third member of the firm. Shortly after the execution of said notes, Sarah A. Geohegan placed her note in the hands of Joseph H. Fitch, who was an attorney at law, for collection when due, and Eliza J. Geohegan also placed her note in his hands for collection shortly after its maturity. Joseph H. Fitch had several interviews with the members of the firm in relation to the payment of the notes and was put off until the 5th or 6th of January, 1886, when he told Harry Geohegan that unless the notes were paid, he would cause judgments to be entered thereon. Harry Geohegan, finding Fitch determined to proceed at once to enforce the collection of the notes, had a long talk with him in which he disclosed fully the situation and financial condition of the firm, from which it appeared that the firm was insolvent and would be unable to continue longer in business, and he thereupon asked Fitch, who, as it seems, had been to some extent, the legal adviser of the firm, to advise him as to what, under the circumstances, would be the best course for the firm to pursue. Fitch replied, that in his opinion a

general assignment for the benefit of creditors was the only course open to them, but at the same time said that they should employ another lawyer, as he, Fitch, could not properly represent both them and the creditors at the same time. This, as it seems, was the first time that the subject of an assignment was suggested by any of the parties. Geohegan, on leaving, said that he would consult with his partners, but expressed the opinion that the firm would not make an assignment, as some of the partners had a strong prejudice against the mode of procedure. The firm, however, consulted another attorney, and as the result of such consultation, they determined to make a general assignment, and Harry Geohegan procured certain blanks to be used in the preparation of such a document. On the evening of January 7th, Fitch drew up all the papers necessary for the entry of judgments on the three notes, leaving blanks only for the name of the attorney who was to sign the cognovits. Harry Geohegan and Thomas G. Fitch were living in the same house with Joseph ·H. Fitch, and on the same evening they went to his room taking said blanks with them, and told him of their determination to make an assignment; he also at the same time telling them that he should enter up judgments on the notes the first thing the next morning, and that everything was in such shape that he would get his executions before they could possibly make their assignment. At this interview Harry Geohegan produced the blanks which he had procured, and Joseph H. Fitch, at his request, filled up in part both the assignment and the schedules. Fitch testifies that in doing this he acted not as the attorney of the firm, but as a mere amanuensis for the partners, and for the reason that he was the best penman present.

The next morning Harry Geohegan, Thomas G. and Joseph H. Fitch and Sarah A. and Eliza J. Geohegan met, in pursuance of a previous arrangement, at the office of Abbot & Johnson, the attorneys for said firm, and there the assignment drawn up the previous evening, and also the declarations and cognovits prepared by Joseph H. Fitch were produced. Just before 10 o'clock said Fitch, who at the time was acting as minute clerk

In re Geohegan..

in the County Court, and for that reason could not attend to the entry of the judgments in person, handed the declarations and cognovit to Mr. Johnson, one of the attorneys acting for said firm in the matter of the assignment, and asked him to go to the Superior Court as soon as it should be opened, and cause the judgments to be entered and executions thereon to be issued and delivered to the Sheriff. In accordance with this request said Johnson went to the court house, caused the judgments to be entered in the Superior Court, took out executions and placed them in the Sheriff's hands. At the time he left his office the assignment appears to have been completed with the exception of the signatures of the members of the firm, and at that time William S. Geohegan, one of the partners, had not arrived. The evidence also tends to show that the execution of the assignment was delayed by an attempt by the firm to arrange with a certain creditor, in whose hands they had placed collaterals for the payment of the indebtedness, so as to get the collaterals back into their own hands. The executions came into the Sheriff's hands at 10:25, 10:26 and 10:27 A. M., and the assignment was executed and recorded at 11 o'clock A. M., the same day. There is evidence tending to show that it was the expectation of all the parties that the execution should take the precedence of the assignment, and that it was the intention of the members of said firm to record the assignment as soon as possible, after the entry of the judgments, so as to prevent the levy of intervening attachments.

The question arising upon the foregoing facts is, whether said judgments and executions and the lien thereby acquired are to be deemed in law a part of the assignment, or are to be regarded as a separate transaction wholly independent of the assignment, and in no way affected thereby. If they are a part of the assignment, they constitute an unlawful preference within the meaning of Sec. 13 of the statute in relation to voluntary assignments for the benefit of creditors, and said liens are consequently void.

The law is now settled in this State that, after a debtor has determined to make an assignment for the benefit of his creditors, all conveyances, transfers or other dispositions of his

property or assets, made in view of his contemplated general assignment, whereby any preference is given, will be held to be a part of the assignment, and therefore void under the 13th section of the statute in relation to voluntary assignments for the benefit of creditors, the same as though incorporated into the deed of assignment itself. Preston v. Spaulding, 120 Ill. 208. But while this is so, the rule is also settled that the debtor, until he has made up his mind to make an assignment, retains the dominion over his property, and may sell, mortgage or pledge it, or create a lien upon it by operation of law, as by confessing a judgment in favor of a *bona fide* creditor.

Under the foregoing rule, there can be no doubt of the validity of the notes and warrants of attorney by virtue of which the judgments in question were confessed. They were given to secure *bona fide* debts at a time when the debtors were not contemplating an assignment. A warrant of attorney is a well known and well recognized security, and the warrants of attorney in question, as soon as they were executed, became, in the hands of the payees of said notes, securities for the debts for which the notes were given, of which said payees were entitled to avail themselves, and which the debtors had no power, by any act of theirs, to set aside or impair. With the entry of a judgment by virtue of a warrant of attorney, the debtor has nothing whatever to do. It is the act of the creditor alone. He and not the debtor has the right to determine when the judgment shall be entered up, and to set on foot the proceedings necessary to have it entered. Such entry is as to the debtor a proceeding *in invitum*, and even if he gives to it the express consent, it becomes his act no more than before.

In Clark v. Iselin, 21 Wall. 360, where the question was whether the entry of a judgment by virtue of a warrant of attorney, given before the insolvency of the debtor, constituted an illegal preference within the prohibition of the 35th section of the Bankrupt Act, the court say: "Now, in a case where a creditor, holding a confession of judgment perfectly lawful when it was given, causes the judgment to be entered of record, how can it be said the debtor procures the entry at the time

In re Geohegan.

it is made? It is true the judgment is entered in virtue of his authority, an authority given when the confession was signed. That may have been years before, or, if not, it may have been when the debtor was perfectly solvent. But no consent is given when the entry is made, where the confession becomes an actual judgment, and when the preference, if it be a preference, is obtained. The debtor has nothing to do with the entry. As to that he is entirely passive. Ordinarily he knows nothing of it, and he could not prevent it if he would. It is impossible, therefore, to maintain that such a judgment is obtained by him when his confession is placed on record. Such an assertion, if made, must rest on a mere fiction."

The 35th section of the Bankrupt Act provided, in substance, that if any person, being insolvent or in contemplation of insolvency, within four months before the filing of a petition by or against him, with a view to give a preference to any creditor, procured or suffered any part of his property to be attached or seized on execution, such creditor having reasonable cause to believe such person to be insolvent, and that such levy was made in fraud of said act, such levy should be void. In Clark v. Iselin, *supra*, a creditor obtained from his debtor while solvent a paper known as a " confession of judgment," equivalent to a warrant of attorney, and kept it in his possession until his debtor became insolvent, and then, with knowledge of such insolvency, entered judgment thereon, and caused the property of his debtor to be seized on execution, and it was held that the levy was valid, and was not a procurement by the debtor of a seizure of his property with a view on his part to give a preference to his creditor, within the meaning of the Bankrupt Act. This conclusion was reached upon the theory that the preference was given, so far as the debtor was concerned, not by the entry of the judgment, but by the execution of the warrant of attorney, and as that instrument was executed at a time when the debtor might lawfully prefer a creditor, the preference was not illegal.

It should be observed that our statute in relation to voluntary assignments is much less sweeping in its provisions than the Bankrupt Act. Under our statute a debtor, though con-

templating insolvency or actually insolvent, may lawfully pre-
fer a creditor, such preference being forbidden only when it
is made at such a time and under such circumstances as to
become, in legal contemplation, a part of the assignment itself.
In other words, it is only such preferences as are made after
the debtor has determined to execute a general assignment of
his property for the benefit of his creditors, that are illegal
and void.    Unlike the Bankrupt Act also, our statute makes
no attempt to regulate the conduct of the creditor.   See
Preston v. Spaulding, *supra*.   His acts, whatever they may be,
done with a view of securing a preference, and his knowledge
of the insolvency of his debtor, or of his intention to make an
assignment, or of his being actually engaged in the execution
of such instrument, can not deprive him of his preference, if
he in fact succeeds in obtaining one.   He may choose his own
time for entering up his judgment, and if he succeeds in per-
fecting his lien before the assignment becomes operative, his
legal priority is established.

But it is said that the priority of the creditors' lien in this
case was brought about, in part at least, by the collusion or
connivance of the debtors.   Such collusion or connivance, so
far as it possesses any legal significance, consisted in a willing-
ness or it may be a desire on the part of the debtors that the
creditors' lien should precede the assignment, and the timing
of the execution of the assignment so as to make it subsequent
to such liens.   If it be admitted that the debtors purposely
delayed their assignment until the creditors had entered up
their judgments and taken out executions, what are the legal
consequences?   The statute imposed upon the debtors no duty
of diligence to defeat the priority of creditors who had valid
warrants of attorney.   They were under no obligation to enter
upon a race of diligence with such creditors, but were only
restrained from giving a preference by any affirmative act of
their own.   Mere non-action on their part until the executions
should become liens, did not make the procuring of the liens
their act.   It was the act of the creditors, and was a lawful
exercise of the power given to them at the time the warrants
of attorney were executed, and long before any assignment

was contemplated.   We do not say that there may not be such active co-operation on the part of a debtor in the entry of a judgment by confession as to make such judgment in legal contemplation his act, but such co-operation must involve something more than mere delay, or even notice to the creditor that an assignment is contemplated.   In this case we find no evidence of such co-operation, and we therefore hold that the liens of the executions are valid, and that they do not constitute an illegal preference within the meaning of the statute.   We are of the opinion that the Circuit Court erred in coming to the opposite conclusion, and the judgment will therefore be reversed and the cause remanded, with instructions to the Circuit Court to affirm the judgment of the County Court.

*Judgment reversed.*